## CIRCUIT COURT OF FREDERICK COUNTY

Rex Financial Corp.

v.

Howard Burkholder

March 3, 1978

Case No. (Law) 3220

By JUDGE ROBERT K. WOLTZ

This is a detinue action by Rex Financial Corporation (hereafter Rex) against Howard Burkholder (hereafter Burkholder) for a house trailer or mobile home purchased by Burkholder from Qatron Mobile Homes, Inc. (hereafter Qatron). The basis of the plaintiff's action is that at the time Burkholder purchased the mobile home, Rex had in it a security interest recorded on a state-issued motor vehicle certificate of title. Burkholder's defense is that as to his purchase rights and title, this recorded security interest is ineffective because Rex allowed possession of the mobile home to be in his vendor, Qatron, a dealer in mobile homes.

Qatron, headquartered in Maryland, maintained a retail sales office and lot for mobile homes at Winchester, Virginia. Rex financed Qatron's purchase of inventory from manufacturers under a floor plan agreement. In May, 1971, Weaver and wife, residents of West Virginia, purchased the then new mobile home now in controversy from Qatron at its Winchester location under an installment sale contract which, by way of creating a security interest, reserved title in the chattel to Qatron. Qatron assigned the contract to a subsidiary of Rex which in turn assigned it to Rex, which assignment by Qatron was subject to a

"recourse agreement" between it and Rex. This recourse agreement provided that Qatron upon demand of Rex would repurchase such an assigned obligation whenever any installment payment was in default or whenever Qatron with the permission of Rex had repossessed the goods covered by such an obligation.

The mobile home was removed to the place of the Weavers' residence in West Virginia following which a certificate of title in their names was issued for the mobile home by authority of that State, the name and address of Rex appearing on the certificate as "lien holder" though no description of the lien itself appears thereon. The certificate of title came into and continued in the possession of Rex.

Payments under the installment contract became delinquent, and in June, 1972, Rex gave Qatron "formal authorization" to repossess this mobile home. Pursuant to authorization, Qatron repossessed the mobile home from West Virginia and brought it to Qatron's local lot. Qatron headquarters, which had requested and been given a "pay off" figure or balance due under the installment contract, instructed its local dealership to sell it at a stated price. The local dealership then cleaned and refurbished it and placed it in inventory on the sale lot, where an inventory of new and used, some repossessed, homes was maintained. From the evidence and inferences from it, the procedure followed by Rex and Qatron in this instance was customary in such cases.

Approximately a month after the repossession, the defendant Burkholder purchased this mobile home as a residence for himself, paying $5,200.00 to Qatron for it with a cashier's check from his bank, together with his personal check for titling fee and tax. He knew this trailer was used, and it is so marked on the form purchase agreement he received from Qatron and also had been informed by Qatron's salesman that it was repossessed. At this time, Burkholder made no inquiry as to title or secured interests respecting the mobile home and had no actual knowledge of these matters. The purchase price was moderately in excess of the balance due under the installment sale contract. Rex, which had known of the repossession and the presence of the mobile home on Qatron's local lot, has received none of the balance due as assignee of the install-

ment sale contract from Qatron or otherwise. After Burkholder had purchased and been living in the mobile home for about nine months, Rex traced it to him and asserted claim to it. The evidence is silent as to what has ever happened to Qatron or the purchase price paid it by Burkholder.

The defendant moved to strike the evidence both at the conclusion of the plaintiff's case and at the conclusion of the whole case on the ground that there was no showing of a security interest as defined in Section 8.1-201(37), Va. Code, in favor of Rex validly subsisting in Virginia; or put more directly, that the recordation of the security interest of Rex on the West Virginia certificate of title was without effect in Virginia.

The court did not agree with this contention and overruled the motions. If the indication of Rex's security interest on the West Virginia certificate of title was a sufficient perfection of its security interest under the statutes of that State, and the defendant does not contend to the contrary, under the then provisions of (4) of § 8.9-103 covering multiple state transactions, that perfection of security interest would be effective in this State. Persuasive authority to the same effect is *In re Smith*, 311 F. Supp. 900 (W.D. Va. 1970), *aff'd sub nom. Callaghan v. Commercial Credit Corp.*, 437 F.2d 894 (4th Cir. 1971), which in a well reasoned opinion harmonized apparent conflicts among §§ 8.9-102, 8.9-103 and 8.9-302.[1] Consequently, at the time Burkholder purchased it from Qatron, Rex did possess a subsisting validly perfected security interest in the mobile home.

This being so, the ultimate problem is whether or not Burkholder's purchase of the collateral is free of

---

[1] Since Smith and the facts of this case, these sections were amended in 1973 so as to clarify and presumably eliminate the need for the harmonizing statutory construction required in Smith. As it existed at the time in question: Section 8.9-103(4) read "(4) Notwithstanding subsections (2) and (3), if personal property is covered by a certificate of title issued under a statute of this State or any other jurisdiction which requires indication on a certificate of title of any security interest in the property as a condition of perfection, then the perfection is governed by the law of the jurisdiction which issued the certificate."

Rex's security interest in it. Section 8.9-307(1)[2] is unavailing as an aid to Burkholder because the security interest was not created by his seller, Qatron. It was the creation of the Weavers, the original buyers of the mobile home who signed the installment sale contract, thereby creating the security interest in this collateral.

This precise point was recently decided in *First American Bank v. Hunning*, 218 Va. 530, 238 S.E.2d 800 (1977). In that case, a dealer sold a mobile home to a buyer, the purchase agreement securing the balance of the deferred purchase money. The buyer, not the dealer was held to be the creator of the security interest, and Section 8.9-307(1) was held ineffective to protect a subsequent buyer in ordinary course of business (from the same dealer) from the superior rights of the assignee of the security interest which had been duly noted on the motor vehicle title certificate.

An important difference between that case and this, however, is that there the secured party until after the resale had no knowledge of the collateral coming back into the possession of the dealer and the latter's resale of it. But § 8.9-307(1) is significant to this case because it clearly establishes that a perfected security interest in collateral is not always an absolute protection to the secured party against third party claims to the same collateral. Though its reach goes further, in the main this section is declarative of our prior case law. *See* Section 8.9-307(1), Va. Code, Virginia Comment.

There are other instances in which a duly perfected security interest in collateral will not prevail over the rights to it of a third party. The bulwark of a perfected security interest generally affords protection to the

---

[2] In pertinent part: "A buyer in ordinary course of business . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

Section 8.1-201(9): "Buyer in the ordinary course of business means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the good buys in ordinary course from a person in the business of selling goods of that kind . . . ." Section 8.1-201(25): "A person knows or has knowledge of a fact when he has actual knowledge of it . . . ."

secured party against those with actual or constructive knowledge of that interest. Nevertheless a secured party cannot with impunity treat or actively allow his collateral to be treated in the channels of commerce in such a way that innocent purchasers will be misled to their detriment. In such instances, the secured party runs the risk that mere constructive knowledge will not avail him because of countervailing rights of the innocent purchaser in the market place and, as a corollary, to avoid undue impediment to the free flow of commerce.

One such instance is contained in § 8.2-403 which, pertinent to this case, states as follows:

> (1) A purchaser of goods acquires all title which his transferor had or had power to transfer
>
> . . . .
>
> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
>
> (3) "Entrusting" includes any delivery and acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

Considering the foregoing subsections in inverse order, the following appears.

There was by Rex an "acquiescence in retention of possession" by Qatron. Both the understanding between Rex and Qatron concerning this and the good or bad motive of Qatron in the matters of "procurement of the entrusting" or "disposition of the goods" are ineffective to prevent the actions of Rex from amounting to an "entrusting."

The entrusting of possession of the used mobile home to Qatron, a merchant who dealt in that kind of goods, empowered it to transfer all Rex's rights to Burkholder who qualified as a "buyer in ordinary course of business," and Qatron did so transfer.

The foregoing conclusions are sufficient to establish Burkholder's right to the mobile home. But by way of reinforcement, as a buyer in ordinary course of business, he is included in the broader category of "purchaser of goods" and as such got all the title which his transferor Qatron "had power to transfer," which means all the rights of the entruster, Rex.

For the foregoing reasons, judgment will enter in favor of defendant Burkholder.